580 A.2d 42

**COMMONWEALTH of Pennsylvania**

v.

**Charles G. MYRTETUS, Appellant.**

Superior Court of Pennsylvania.

Submitted July 23, 1990.

Decided Aug. 22, 1990.

David G. Ennis, Norristown, for appellant.

Alan M. Rubenstein, Dist. Atty., Doylestown, for Com., appellee.

Before CAVANAUGH, TAMILIA and HESTER, JJ.

TAMILIA, Judge:

Appellant Charles Myrtetus appeals judgment of sentence entered January 12, 1990, following a jury trial in which appellant was found guilty of driving under the influence,[1] pursuant to being stopped at a formalized roadblock program instituted by the Upper Southampton Township Police Department. Appellant was sentenced to a term of imprisonment of not less than 30 days nor more than 12 months.

On appeal, appellant first challenges the constitutionality of drunk driving roadblocks under both the Pennsylvania and United States Constitutions as unreasonable searches and seizures.

In *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987), our Supreme Court stated as dicta that a drunken driver roadblock conducted substantially in compliance with suggested guidelines would not be violative of the Pennsylvania Constitution. The Court, however, found that the provisions of section 6308(b) of the Vehicle Code did not authorize the police to conduct such roadblocks. The Court described appropriate guidelines as follows:

[T]he conduct of the roadblock itself can be such that it requires only a momentary stop to allow the police to make a brief but trained observation of a vehicle's driver, without entailing any physical search of the vehicle or its occupants. To avoid unnecessary surprise to motorists, the existence of a roadblock can be so conducted as to be ascertainable from a reasonable distance or otherwise made knowable in advance. The possibility of arbitrary roadblocks can be significantly curtailed by the institution of certain safeguards. First, the very decision to hold a drunk-driver roadblock, as well as the decision as to its time and place, should be matters reserved for prior administrative approval, thus removing the determination of those matters from the discretion of police officers in the field. In this connection it is essential that the route selected for the roadblock be one which, based on local

1. 75 Pa.C.S. § 3731(a)(4).

experience, is likely to be travelled by intoxicated drivers. The time of the roadblock should be governed by the same consideration. Additionally, the question of which vehicles to stop at the roadblock should not be left to the unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards prefixed by administrative decision.

Following the arrests in *Tarbert*, the legislature amended section 6308(b) to provide:

(b) Authority of police officer.—Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has articulable and reasonable grounds to suspect a violation of this title, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

As amended 1983, July 22, P.L. 122, No. 32, § 4, imd. effective; 1985, June 19, P.L. 49, No. 20, § 10, effective in 60 days.

75 Pa.C.S. § 6308(b).

In *Commonwealth v. Fioretti*, 371 Pa.Super. 535, 538 A.2d 570 (1988), this Court was presented with the opportunity to decide a case with the benefit of both the *Tarbert* guidelines and amended section 6308(b), and found roadblocks established in compliance therewith would be constitutional.

Appellant concedes the roadblock involved instantly was lawful under existing Pennsylvania law, yet still contends the roadblock amounted to an unreasonable search and seizure. We therefore analyze appellant's claim in light of the recent Supreme Court decision in *Michigan Dept. of State Police, et al. v. Sitz, et al.*, 496 U.S. ——, 110 S.Ct.

2481, 110 L.Ed.2d 412.[2]

*Sitz* presents a nearly identical situation to the case at bar, in that guidelines were created setting forth procedures governing roadblock operations, site selection and publicity.

Under the guidelines, checkpoints would be set up at selected sites along state roads. All vehicles passing through a checkpoint would be stopped and their drivers briefly examined for signs of intoxication. In cases where a checkpoint officer detected signs of intoxication, the motorist would be directed to a location out of the traffic flow where an officer would check the motorist's driver's license and car registration and, if warranted, conduct further sobriety tests. Should the field tests and the officer's observations suggest that the driver was intoxicated, an arrest would be made. All other drivers would be permitted to resume their journey immediately.

*Id.* at ——, 110 S.Ct. at 2484.

In deciding *Sitz*, the Court utilized a balancing analysis set forth in *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), in approving highway checkpoints for detecting illegal aliens. The *Martinez–Fuerte* balancing test weighed the intrusion of a particular law enforcement practice on the individual's fourth amendment interests against its promotion of legitimate governmental interests.

As to the government interest in preventing drunken driving, the Court stated, "No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." *Sitz, supra* 496 U.S. at ——, 110 S.Ct. at 2485.

Conversely, the weight bearing on the other scale—the measure of the intrusion on motorists stopped briefly at

---

**2.** *Michigan Dept. of State Police, et al. v. Sitz, et al.,* 496 U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), had not yet been decided by the Supreme Court at the time this case was submitted on appeal. Appellant, therefore, did not have the benefit of the Court's Opinion and in his brief relied on the Michigan Court of Appeals decision which found roadblocks unconstitutional.

sobriety checkpoints—is slight. We reached a similar conclusion as to the intrusion on motorists subjected to a brief stop at a highway checkpoint for detecting illegal aliens. See [*United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) ], *supra*, at 558 [96 S.Ct. at 3083]. We see virtually no difference between the levels of intrusion on law-abiding motorists from the brief stops necessary to the effectuation of these two types of checkpoints, which to the average motorists would seem identical save for the nature of the questions the checkpoint officers might ask. The trial court and the Court of Appeals, thus, accurately gauged the "objective" intrusion, measured by the duration of the seizure and the intensity of the investigation, as minimal.

*Id.*

The Court also reiterated its finding in *Martinez–Fuerte* that the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop because "the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." *Martinez–Fuerte, supra,* 428 U.S. at 558, 96 S.Ct. at 3083. In *Sitz*, "checkpoints are selected pursuant to the guidelines, and uniformed police officers stop every approaching vehicle. The intrusion resulting from the brief stop at the sobriety checkpoint is for constitutional purposes indistinguishable from the checkpoint stops we upheld in *Martinez–Fuerte*." *Sitz, supra* 496 U.S. at ——, 110 S.Ct. at 2487.

Although appellant argues sobriety checkpoints are an ineffective means of combatting drunken driving, as evidenced by appellant's being the only person arrested on April 29, 1989, and this ineffectiveness heightens the intrusiveness of the stop, the Supreme Court was not persuaded by this argument in *Sitz*. The Court defined effectiveness as "the degree to which the seizure advances the public

interest." *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 362 (1979).

> This passage from [*Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 362 (1979)] was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

*Sitz, supra* 496 U.S. at ——, 110 S.Ct. at 2487.

Applying the above state and federal guidelines to the case at bar, we cite with approval a portion of the trial court Opinion dealing with the procedures implemented, leading up to appellant's arrest.

> At the suppression hearing in the instant case, Walter Stevens, Chief of Police of Upper Southamtpon [sic] Township, testified that he decided to institute a roadblock from Friday evening, April 28, 1989, to the early hours of Saturday morning, April 29, 1989, and that it should be located at 939 Street Road. The Chief testified that he had selected the particular location and the time of the roadblock based upon a statistical review of prior DUI incidents and times and places of DUI occurrences. He also stated that the selected roadblock location, time and day of the week were among the highest for DUI arrests as shown by the study.

> A press release was prepared and sent to the local newspaper and published on April 23, 1989 announcing that the roadblock checkpoint would be established for 10:00 p.m. on the following Friday. The press release

detailed the procedures which would be used in the test-ing program.

\* \* \* \* \* \*

The Chief testified that signs were, in fact, established at the checkpoint, that 17 officers were involved; that every fifth car was stopped; that the area was illuminated by fire truck lights and advance warning signs; that the stops were kept brief; that only very basic questions were asked of each stopped driver; and that if there was no problem, the drivers were immediately released.

\* \* \* \* \* \*

Officer Mark Zielinski testified at the suppression hearing that at 1:23 a.m. he was one of about eight or ten officers at the scene, that the defendant was one of the vehicles randomly selected in accordance with the Chief's every fifth car formula. He noted that the defendant was behind the wheel of a silver Toyota Cressida and was alone. When Zielinski conversed with the defendant, he noted immediately that the defendant had bloodshot eyes, a moderate odor of alcohol and exhibited slurred speech. Believing that he was possibly under the influence of alcohol, he requested the defendant to exit the vehicle and submit to a pre-arrest breath test under § 1547(k) of the Vehicle Code. The reading on the "Alcosensor" equipment, which had been preapproved as a testing device, noted a reading of .11%.

Thereafter, the defendant was advised of the implied consent provisions of § 1547 and escorted to police headquarters where Officer Conaway administered the formal breathalyzer test.

At the conclusion of the suppression hearing, we found that the roadblock guidelines had been followed and refused to suppress. At trial, Officer Conaway testified as to the proper certification of the equipment and his experience over 20 years in operating breath test machines. After a 20 minute waiting period to warm up the equipment, the implied consent advice was again given to the defendant who consented to the test. The test records

showed BAC readings of .140% at 1:55 a.m. on the first test and .146% at 1:57 a.m. on the second.

(Slip Op., Kelton, J., 12/14/89, pp. 4–6.)

From our examination of the record, we agree with the trial court that the roadblock program carried out by the Upper Southampton Township Police Department met the constitutional requirements imposed under the Pennsylvania and United States Constitutions, and therefore appellant's argument is without merit.

■ Appellant next argues the trial court erred in not admitting into evidence the results of a preliminary breath test where such results are exculpatory and where appellant and not the Commonwealth seeks to offer or elicit the results of the test. Appellant presented expert testimony from a toxicologist that at the time appellant was stopped by the police, his blood alcohol level was below .10 per cent. The toxicologist's opinion was that alcohol was being rapidly absorbed into appellant's blood stream, accounting for the increase in the second of two intoximeter tests from .140 per cent to .146 per cent in a period of two minutes. To corroborate appellant's theory his blood alcohol level was increasing and at the time he was driving it had not yet reached the legal limit of .10 per cent, appellant attempted to introduce the result of the preliminary breath test reading of .11 per cent, obtained seven minutes after appellant was stopped.

The trial court based its decision on a section of the Vehicle Code dealing with chemical testing to determine the alcoholic content of blood. The statute provides in pertinent part:

(k) Prearrest breath test authorized.—A police officer, having reasonable suspicion to believe a person is driving or in actual physical control of the movement of a motor vehicle while under the influence of alcohol, may require that person prior to arrest to submit to a preliminary breath test on a device approved by the Department of Health for this purpose. *The sole purpose of this pre-*

*liminary breath test is to assist the officer in determining whether or not the person should be placed under arrest.* The preliminary breath test shall be in addition to any other requirements of this title. No person has any right to expect or demand a preliminary breath test. Refusal to submit to the test shall not be considered for purposes of subsections (b) and (e).

75 Pa.C.S. § 1547(k) (emphasis added).

While appellant concedes the intent of section 1547(k) is to preclude the Commonwealth from using the results from a preliminary breath test to obtain a conviction, but only to determine probable cause to arrest, appellant also argues the statute should not preclude appellant from electing to introduce the test results. However, we find another subsection of section 1547 instructive on this issue.

(c) Test results admissible in evidence.—In any summary proceeding or criminal proceeding in which the defendant is charged with a violation of section 3731 or any other violation of this title arising out of the same action, the amount of alcohol or controlled substance in the defendant's blood, as shown by chemical testing of the person's breath, blood or urine, *which tests were conducted by qualified persons using approved equipment,* shall be admissible in evidence.

(1) Chemical tests of breath shall be performed on devices approved by the Department of Health using procedures prescribed jointly by regulations of the departments of Health and Transportation. *Devices shall have been calibrated and tested for accuracy* within a period of time and in a manner specified by regulations of the Departments of Health and Transportation. For purposes of breath testing, a qualified person means a person who has fulfilled the training requirement in the use of the equipment in a training program approved by the Departments of Health and Transportation. A certificate or log showing that a device was calibrated and tested for accuracy and that the device was accu-

rate shall be presumptive evidence of those facts in every proceeding in which a violation of this title is charged.

75 Pa.C.S. § 1547(c) (emphasis added).

In attempting to ascertain the meaning of a statute, we are required to consider the intent of the legislature and are permitted to examine the practical consequences of a particular interpretation. *Commonwealth v. Stewart*, 375 Pa.Super. 585, 544 A.2d 1384 (1988). We are to presume the legislature did not intend a result that is unreasonable. *Commonwealth v. Martorano*, 387 Pa.Super. 151, 563 A.2d 1229 (1989).

We agree with the Commonwealth that while the preliminary breath test device in question is an approved device, it is not one which is calibrated and tested for accuracy. The preliminary blood test serves only as an aid to police in determining probable cause for arrest. Appellant or the Commonwealth may introduce into evidence later the results of chemical tests of breath or blood taken after arrest. This evidence is admitted because of its presumptive validity and reliability. No such presumption can be made from the preliminary breath test, nor do we find the legislature intended to create such a presumption. We therefore find no error by the trial court in excluding evidence of the preliminary breath test, and this claim is without merit.

Judgment of sentence affirmed.